FILED by D.C.
ELECTRONIC

**JULY 30, 2009**

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
PALM BEACH DIVISION

CASE NO: **09-CV-81108-Cohn/Seltzer**

CENTURY COMMUNICATIONS OF FLORIDA, INC.,
A Florida corporation, CENTURY DANIEL'S LANDING,
LLC, a Florida limited liability company, CENTURY
FALCON PARC, LLC, a Florida limited liability company,
CENTURY FALCON PINES, LLC, a Florida limited liability
Company, CENTURY HAMMOCKS, LLC, a
Florida limited liability company, CENTURY
INDEPEDENDENCE, LLC, a Florida limited liability
Company, CENTURY LIVE OAK PRESERVE, LLC, a Florida
Limited liability company, CENTURY SAVANNAH PINES,
LLC, a Florida limited liability company, CENTURY
SAVANNAH LANDINGS, LLC, a Florida limited
Liability company and CENTURY VICTORIA PINES
LANDINGS, LLC, a Florida limited liability company,

     Plaintiffs,

v.

BRIGHT HOUSE NETWORKS, LLC,
a Delaware limited liability company,

     Defendant.

_____/

## NOTICE OF REMOVAL

     Defendant, Bright House Networks, LLC ("Bright House" or "Defendant"), by and through its undersigned counsel, hereby files this Notice of Removal and alleges:

     1)    Bright House has been named as a Defendant in a civil action that was commenced in the Circuit Court of the Fifteenth Judicial Circuit in and for Palm Beach County, Florida, which civil action has been assigned Case number: 502009CA022134XXXXMBAA and which is styled: *Century Communications of Florida, Inc., a Florida corporation, et. al. v. Bright House Networks, LLC.*

RM:6633541:1

2)      Service was effectuated on Bright House by serving a Summons and Complaint on June 30, 2009 upon Deirdre Nerges, Corporation Paralegal, Sabin Bermant & Gould, LLP, Four Times Square, Suite 2300, New York, NY   10036. Copies of the Civil Cover Sheet, Summons, Return of Service and Complaint and are attached hereto as composite Exhibit "A." These documents constitute all the pleadings filed with the Palm Beach Circuit Court Clerk's office in the state court action.

3)      Thirty (30) days have not yet expired since this action became removable to this Court.

4)      The above-styled action is one in which this Court has original jurisdiction under the provisions of 28 U.S.C. § 1441, in that it: (i) is a civil action wherein the matter in controversy exceeds $75,000.00, exclusive of interest and costs; (ii) is between citizens of a state and a citizen of another state.[1]  (*See,* Paragraphs 1 – 10, 13, 16, 17, and *ad damnum* clauses to Counts I and II of the Complaint attached hereto as part of Composite Exhibit "A".) (*See also* Declaration of Michael Wilbur, attached hereto as Exhibit "B", at ¶¶2-8.) (*See also* Declaration of Elliot Hallak, attached hereto as Exhibit "C", at ¶¶3-4 and Exhibit 1.)

5)      First, the matter in controversy exceeds the sum or value of Seventy-Five Thousand Dollars ($75,000.00), exclusive of interest and costs.  (*See,* Paragraph 13, 16, 17, and *ad damnum* clauses to Counts I and II of the Complaint attached hereto as part of Composite Exhibit "A.")

6)      Second, the above-styled action involves a controversy which is wholly between citizens of different states. Plaintiffs herein are a Florida corporation with its principal place of business in Florida and nine (9) Florida limited liability companies, wherein each of their

---

[1] To the extent necessary, pursuant to Federal Rule of Evidence 201, Bright House hereby requests that the Court take judicial notice of the records of the Florida Department of State, Division of Corporations, attached hereto Composite Exhibit "1" to the Affidavit of Elliot A. Hallak, Esq.

members is a citizen of the State of Florida.  Defendant is a Delaware limited liability company and its member is a citizen of the State of New York. (*See,* Paragraphs 1 - 10 of Plaintiffs' Complaint, attached hereto as part of composite Exhibit "A" and 28 U.S.C.§1332(a)(2)) (*See also* Declaration of Michael Wilbur, attached hereto as Exhibit "B", at ¶¶2-8.)  (*See also* Declaration of Elliot Hallak, attached hereto as Exhibit "C", at ¶¶3-4 and Exhibit 1.).

7)      There are no other known Defendants in this matter from whom consent to removal of this action need be obtained.

8)      Finally, Defendant was not at the time of the commencement of this action and is still not a citizen of the State of Florida, where this action was brought.  (*See,* Paragraph 10 of Plaintiffs' Complaint attached hereto as part of Composite Exhibit "A," and 28 U.S.C.§ 1332 (a)(2) (*See also* Declaration of Michael Wilbur, attached hereto as Exhibit "B", at ¶¶2-8.).

WHEREFORE, Defendant, Bright House Networks, LLC, respectfully prays that the above described action, now pending in the Circuit Court of the Fifteenth Judicial Circuit in and for Palm Beach County, Florida, Case number: 502009CA022134XXXXMBAA, be removed to the United States District Court for the Southern District of Florida and Division within which the above-described action is pending.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing document was furnished by U.S. Mail on the 30 day of July, 2009 to: Nathan E. Nason, Esq. and John D. Foster, Esq., Nason, Yeager, Gerson, White & Lioce, PA, 1645 Palm Beach Lakes Boulevard, Suite 1200, West Palm Beach, FL 33401.

RUDEN, MCCLOSKY, SMITH
SCHUSTER & RUSSELL, P.A.
222 Lakeview Avenue, Suite 800
West Palm Beach, FL 33401
Telephone: (561) 838-4500
Facsimile: (561) 514-3447

By: _____

Amy S. Rubin/FBN: 476048
amy.rubin@ruden.com
Elliot A. Hallak/FBN: 762741
Elliot.hallak@ruden.com

*Attorneys for Defendant, Bright House Networks, LLC*

RM:6633541:1

 **CT Corporation**

**Service of Process
Transmittal**
06/30/2009
CT Log Number 515075516

**TO:** Deirdre Nerges, Corporate Paralegal
Sabin Bermant & Gould LLP
Four Times Square, Suite 2300
New York, NY 10036-6526

**RE:** **Process Served in Florida**

**FOR:** Bright House Networks, LLC (Domestic State: DE)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | Century Communications of Florida, Inc., etc., et al., Pltfs. vs. Bright House Networks, LLC, etc., Dft. |
| **DOCUMENT(S) SERVED:** | Summons, Complaint, Exhibit(s) |
| **COURT/AGENCY:** | Palm Beach County Circuit Court, FL
Case # 50 2009 CA 022130XXXXMB |
| **NATURE OF ACTION:** | Action for Specific Performance of the Purchase Agreement and the Amended Agreement regarding the Sale of Telecommunication Systems and other supporting systems to the Dft. - Failure to transfer the escrow amount it its entirety to Pltf. - Seeking Declaratory Judgment |
| **ON WHOM PROCESS WAS SERVED:** | C T Corporation System, Plantation, FL |
| **DATE AND HOUR OF SERVICE:** | By Process Server on 06/30/2009 at 12:55 |
| **APPEARANCE OR ANSWER DUE:** | Within 20 days after service, exclusive of the day of service |
| **ATTORNEY(S) / SENDER(S):** | Nathan E. Nason
Nason, Yeager, Gerson, White & Lioce, P.A.
1645 Palm Beach Lakes Boulevard
Suite 1200
West Palm Beach, FL 33401
561-686-3307 |
| **ACTION ITEMS:** | CT has retained the current log, Retain Date: 06/30/2009, Expected Purge Date: 07/05/2009
Image SOP
Email Notification, Deirdre Nerges Dnerges@sbandg.com |
| **SIGNED:**
**PER:**
**ADDRESS:**
**TELEPHONE:** | C T Corporation System
Donna Moch
1200 South Pine Island Road
Plantation, FL 33324
954-473-5503 |

Page 1 of  1 / LH

Information displayed on this transmittal is for CT Corporation's
record keeping purposes only and is provided to the recipient for
quick reference. This information does not constitute a legal
opinion as to the nature of action, the amount of damages, the
answer date, or any information contained in the documents
themselves. Recipient is responsible for interpreting said
documents and for taking appropriate action. Signatures on
certified mail receipts confirm receipt of package only, not
contents.

Composite
Exhibit
A

Jun. 30. 2009 11:35AM     NYG   L, P. A.                                          No. 1029   P. 2

IN THE CIRCUIT COURT
OF THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, FLORIDA

CASE NO. _____

50 2009 CA 022134XXXXMB

CENTURY COMMUNICATIONS OF FLORIDA, INC.,
a Florida corporation, CENTURY DANIEL'S LANDING, LLC, a
Florida limited liability company, CENTURY
FALCON PARC, LLC, a Florida limited
liability company, CENTURY FALCON
PINES, LLC, a Florida limited liability
company, CENTURY HAMMOCKS, LLC, a
Florida limited liability company, CENTURY
INDEPENDENCE, LLC, a Florida limited
liability company, CENTURY LIVE OAK
PRESERVE, LLC, a Florida limited liability
company, CENTURY SAVANNAH PINES, LLC,
a Florida limited liability company, CENTURY
SAVANNAH LANDING, LLC, a Florida limited
liability company and CENTURY VICTORIA PINES
LANDING, LLC, a Florida limited liability company,

              Plaintiffs,

vs.

BRIGHT HOUSE NETWORKS, LLC,
a Delaware limited liability company,

              Defendant.
_____/

**SUMMONS**

THE STATE OF FLORIDA:

To Each Sheriff of the State:

YOU ARE COMMANDED to serve this Summons and a copy of the Complaint or Petition in this action
on Defendant:

              **BRIGHT HOUSE NETWORKS, LLC**
              **REGISTERED AGENT**
              **C T CORPORATION SYSTEM**
              **1200 SOUTH PINE ISLAND ROAD**
              **PLANTATION, FL 33324**

1

Each Defendant is required to serve written defenses to the Complaint or Petition on

### JOHN D. FOSTER, ESQUIRE

Plaintiff's attorney, whose address and phone number is:

### NASON, YEAGER, GERSON, WHITE & LIOCE, P.A.
**1645 Palm Beach Lakes Boulevard, Suite 1200**
**West Palm Beach, Florida 33401**
**Telephone: (561) 686-3307**

within **20 days** after service of this summons on that Defendant, exclusive of the day of service, and to file the original of the defenses with the Clerk of this Court either before service on Plaintiff's attorney or immediately thereafter. If a Defendant fails to do so, a default will be entered against that Defendant for the relief demanded in the Complaint or Petition.

In accordance with the Americans With Disabilities Act of 1990, persons in need of a special accommodation to participate in this proceeding should contact (the Court ADA Coordinator) (Attorney ADA Coordinator) no later than seven (7) days prior to the proceeding (Florida Relay Service Number 1-800-955-8771) for assistance.

SHARON R. BOCK
Clerk & Comptroller
P.O. Box 4667

DATED on _____, 2009.

                                    West Palm Beach, Florida
                    SHARON R. BOCK      33402-4667
                    Clerk of Circuit Court

JUN 26 2009

(Court Seal)                            GINA BRIMMER

                    By: _____
                        Deputy Clerk

H:\09Admin\JDF\NCS\PSummonsBrightHouseNetworks,LLCJDF/ppe

2

# RETURN OF SERVICE

**State of Florida**          **County of Palm Beach**                    **Circuit Court**

Case Number: 502009CA022134XXXXMB



PLAINTIFF:
**CENTURY COMMUNICATIONS OF FLORIDA, INC.**

vs.

DEFENDANT:
**BRIGHT HOUSE NETWORKS, LLC**

Received by MAJESTIC PROCESS on the 30th day of June, 2009 at 11:00 am to be served on **BRIGHT HOUSE NETWORKS, LLC, C/O RA, CT CORP, 1200 S. PINE ISLAND ROAD, PLANTATION, FL.**

I, Richard Lang, do hereby affirm that on the **30th day of June, 2009 at 12:55 pm,** I:

Served the within named corporation by delivering a true copy of the **SUMMONS AND COMPLAINT** with the date and hour of service endorsed thereon by me to DONNA MOCH AT CT CORP. as **Registered Agent** of the within named corporation, in compliance with State Statutes.

**Description** of Person Served: Age: 40,  Sex: F,  Race/Skin Color: White,  Height: 5'2",  Weight: 120,  Hair: Brown, Glasses: N

I certify that I am over the age of 18, have no interest in the above action, and am a Special Process Server, in good standing, in Broward County, Florida, the County in which this process was served. Under penalty of perjury, I declare that I have read the foregoing Verified Return of Service and that the facts stated in it are true.

**Richard Lang**
Sps #259

**MAJESTIC PROCESS**
**1008 North Lakeside Drive**
**Lake Worth, FL  33460**
**(561) 533-0330**

Our Job Serial Number: 2009011598

Copyright © 1992-2008 Database Services, Inc. - Process Server's Toolbox V6.3e

IN THE CIRCUIT COURT
OF THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, FLORIDA

CASE NO. _____

CENTURY COMMUNICATIONS OF FLORIDA, INC.,
a Florida corporation, CENTURY DANIEL'S LANDING, LLC
Florida limited liability company, CENTURY
FALCON PARC, LLC, a Florida limited
liability company, CENTURY FALCON
PINES, LLC, a Florida limited liability
company, CENTURY HAMMOCKS, LLC, a
Florida limited liability company, CENTURY
INDEPENDENCE, LLC, a Florida limited
liability company, CENTURY LIVE OAK
PRESERVE, LLC, a Florida limited liability
company, CENTURY SAVANNAH PINES, LLC,
a Florida limited liability company, CENTURY
SAVANNAH LANDING, LLC, a Florida limited
liability company and CENTURY VICTORIA PINES
LANDING, LLC, a Florida limited liability company,

**SUMMONS**

     Plaintiffs,

vs.

BRIGHT HOUSE NETWORKS, LLC,
a Delaware limited liability company,

     Defendant.

_____/

50 2009 CA 0 2 2 1 3 4 XXXX MB

09 JUN 26  PM 4: 01   FILED
CIRCUIT CIVIL 4
CIRCUIT COUNTY, FL

THE STATE OF FLORIDA:

To Each Sheriff of the State:

YOU ARE COMMANDED to serve this Summons and a copy of the Complaint or Petition in this action
on Defendant:

     **BRIGHT HOUSE NETWORKS, LLC**
     **REGISTERED AGENT**
     **C T CORPORATION SYSTEM**
     **1200 SOUTH PINE ISLAND ROAD**
     **PLANTATION, FL 33324**

1

Each Defendant is required to serve written defenses to the Complaint or Petition on

**JOHN D. FOSTER, ESQUIRE**

Plaintiff's attorney, whose address and phone number is:

**NASON, YEAGER, GERSON, WHITE & LIOCE, P.A.**
**1645 Palm Beach Lakes Boulevard, Suite 1200**
**West Palm Beach, Florida 33401**
**Telephone: (561) 686-3307**

within **20 days** after service of this summons on that Defendant, exclusive of the day of service, and to file the original of the defenses with the Clerk of this Court either before service on Plaintiff's attorney or immediately thereafter. If a Defendant fails to do so, a default will be entered against that Defendant for the relief demanded in the Complaint or Petition.

In accordance with the Americans With Disabilities Act of 1990, persons in need of a special accommodation to participate in this proceeding should contact (the Court ADA Coordinator) (Attorney ADA Coordinator) no later than seven (7) days prior to the proceeding (Florida Relay Service Number 1-800-955-8771) for assistance.

DATED on _____, 2009.

JUN 26 2009

SHARON R. BOCK
Clerk & Comptroller
P.O. Box 4667
West Palm Beach, Florida
33402-4667

SHARON R. BOCK
Circuit Court

(Court Seal)

Deputy Clerk

GINA BRIMMER

H:\09Admin\JDF\NCS\PSummonsBrightHouseNetworks,LLCJDF/ppe

2

7254-2519

IN THE CIRCUIT COURT
OF THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, FLORIDA

CASE NO. _____

**50 2009 CA 0 2 2 1 3 4 XXXX MB**

CENTURY COMMUNICATIONS OF FLORIDA, INC.,
a Florida corporation. CENTURY DANIEL'S LANDING, LLC, a
Florida limited liability company, CENTURY
FALCON PARC, LLC, a Florida limited
liability company, CENTURY FALCON
PINES, LLC, a Florida limited liability
company, CENTURY HAMMOCKS, LLC, a
Florida limited liability company, CENTURY
INDEPENDENCE, LLC, a Florida limited
liability company, CENTURY LIVE OAK
PRESERVE, LLC, a Florida limited liability
company, CENTURY SAVANNAH PINES, LLC,
a Florida limited liability company, CENTURY
SAVANNAH LANDING, LLC, a Florida limited
liability company and CENTURY VICTORIA PINES
LANDING, LLC, a Florida limited liability company,



COPY
RECEIVED FOR FILING

JUN 26 2009
SHARON R. BOCK
CLERK & COMPTROLLER
CIRCUIT CIVIL DIVISION

     Plaintiffs,

vs.

BRIGHT HOUSE NETWORKS, LLC,
a Delaware limited liability company,

     Defendant.

_____/

## COMPLAINT

Plaintiffs, CENTURY COMMUNICATIONS OF FLORIDA, INC., a Florida corporation

("Century"), CENTURY DANIEL'S LANDING, LLC, a Florida limited liability company

("Daniels"), CENTURY FALCON PARC, LLC, a Florida limited liability company ("Falcon

Parc"), CENTURY FALCON PINES, LLC, a Florida limited liability company ("Falcon Pines"),

CENTURY HAMMOCKS, LLC, a Florida limited liability company ("Hammocks"),

CENTURY INDEPENDENCE, LLC, a Florida limited liability company ("Independence"),

CENTURY LIVE OAK PRESERVE. LLC, a Florida limited liability company ("Live Oak"),
CENTURY SAVANNAH PINES, LLC, a Florida limited liability company ("Savannah Pines"),
CENTURY SAVANNAH LANDING. LLC, a Florida limited liability company ("Savannah
Landing") and CENTURY VICTORIA PINES LANDING, LLC, a Florida limited liability
company ("Victorian Pines"), (collectively hereafter "Sellers") hereby sue the Defendant,
BRIGHT HOUSE NETWORKS, LLC, a Delaware limited liability company ("Buyer"), as
follows:

### Parties

1.      Plaintiff. Century, is a Florida corporation doing business in Palm Beach County,
Florida.

2.      Plaintiff, Daniels, is a Florida limited liability company doing business in Palm
Beach County, Florida.

3.      Plaintiff, Falcon Parc, is a Florida limited liability company doing business in
Palm Beach County, Florida.

4.      Plaintiff, Falcon Pines, is a Florida limited liability company doing business in
Palm Beach County, Florida.

5.      Plaintiff, Independence, is a Florida limited liability company doing business in
Palm Beach County, Florida.

6.      Plaintiff, Live Oaks, is a Florida limited liability company doing business in Palm
Beach County, Florida.

7.      Plaintiff, Savannah Pines, is a Florida limited liability company doing business in
Palm Beach County, Florida.

8.      Plaintiff, Savannah Landing, is a Florida limited liability company doing business
in Palm Beach County, Florida.

2

9.    Plaintiff, Victorian Pines, is a Florida limited liability company doing business in Palm Beach County, Florida.

10.   Defendant, Buyer is a Delaware limited liability company doing business in Palm Beach County, Florida.

## General Allegations

11.   On or about February 21, 2008 Sellers and Buyer entered into an Asset Purchase Agreement ("Purchase Agreement") for the sale of telecommunication systems and other supporting systems to Buyer. (A true and correct copy of this Purchase Agreement is attached hereto as Exhibit A.)

12.   The Purchase Agreement was amended by the Amendment to the Asset Purchase Agreement dated May 30, 2008 ("Amended Agreement"). A true and correct copy of this Amended Agreement is attached hereto as Exhibit B.

14.   Pursuant to the Purchase Agreement, Buyers were required to deposit a cash deposit in the amount of $1,100,000.00 ("Escrow Amount") to be held in escrow for a period of one year following the closing date.  The Purchase Agreement further provided for Buyer to agree to tender the Escrow Amount to Sellers absent any valid claims for indemnification by Buyer against Sellers.

15.   The transaction contemplated by the Purchase Agreement closed on June 10, 2008 and Buyer deposited the required Escrow Amount pursuant to the Purchase Agreement and Escrow Agreement.

16.   Although a year has transpired since the close of the transaction and no valid claims for indemnification exist, Buyer has refused, in direct contravention to the Purchase Agreement, to agree to tender the Escrow Amount to Seller.

3

17.     Paragraph 11.12 of the Purchase Agreement provides that the prevailing party in an action to enforce the terms of the Purchase Agreement shall be entitled to recover their cost and attorneys' fees.

18.     Sellers have retained the undersigned and agreed to pay a reasonable fee for their services.

19.     All conditions precedent have occurred or have otherwise been waived.

## Count I
## Declaratory Judgment

20.     Sellers reallege paragraphs 1 through 19 as if fully set forth herein and incorporate same by reference.

21.     This is an action for a declaratory judgment.

22.     There is a bona fide, actual, present and practical need for this declaration.  This declaration deals with existing facts regarding the Seller's rights under the Purchase Agreement as amended by the Amended Agreement, and is dependant upon the applicable laws as it relates to facts found in said agreements.

23.     Sellers have an actual present and adverse interest in the Purchase Agreement and Amended Agreement and are not seeking legal advice by the Court or to satisfy curiosity.

24.     All adverse interests are before the court by proper process to the filing of this declaratory action.

26.     Sellers contend that they have a right to the Escrow Amount deposited pursuant to the Purchase Agreement and the Amended Agreement.

27.     Buyer contends that Sellers have no right to the Escrow Amount as a result of certain alleged breaches to the Purchase Agreement.

28.     Sellers are uncertain as to the nature and extent of their rights under the Purchase Agreement and the Amended Agreement. The Florida Legislature has provided at Fla. Stat. §86.101 that "its purpose is to settle and to afford relief from insecurity and uncertainty with

4

respect to rights, status, and other equitable or legal relations and is to be liberally, administered and construed." *Fla. Stat. §86.101 (2008).*

WHEREFORE, Sellers request that this Court enter a judgment declaring that:

(1) the Purchase Agreement is valid and enforceable;

(2) the Amended Agreement is valid and enforceable;

(3) the Sellers are entitled to direct the Buyer to transfer the Escrow Amount, in its entirety, to Sellers;

(4) Sellers are entitled to additional relief according to the Purchase Agreement and Amended Agreement;

(5) Sellers are entitled to any other relief this Court deems proper, including but not limited to, costs and attorneys' fees; and

(6) for such other relief that this Court deems appropriate under the circumstances

## Count II
### Specific Performance

29.    Sellers reallege paragraphs 1 through 19 as if fully set forth herein and incorporate same by reference.

30.    This is an action for specific performance of the Purchase Agreement and the Amended Agreement.

31.    Although Sellers are now entitled to the Escrow Amount, Buyer has refused to agree to the transfer of the Escrow Amount to Sellers.

33.    Sellers have complied with the Purchase Agreement and Amended Agreement and demand conveyance of the Escrow Amount pursuant to the Purchase Agreement and Amended Agreement.

34.    Buyer has failed, refused and continues to refuse to perform its part of the Purchase Agreement.

35.    Sellers do not have an adequate remedy at law.

5

WHEREFORE, Sellers demand that this Court enter a judgment against Buyer requiring Buyer to perform it obligations under the Purchase Agreement and Amended Agreement, instructing the transfer of the Escrow Amount, in its entirety to Sellers, awarding costs and attorneys' fees and granting any other relief this Court deems appropriate under the circumstances.

## Count III
### Breach of Contract

36.     Sellers reallege paragraphs 1 though 18 as if fully set forth herein and incorporate same by reference.

37.     This is an action for damages in excess of $15,000.00.

38.     Buyer, by letter dated June 9, 2008, notified the Escrow Agent to withhold the Escrow Amount.

39.     Buyer has failed to agreed to the transfer of the Escrow Amount to Sellers although the time to do so has elapsed.

39.     As a result, Buyer has breached the Purchase Agreement and the Amended Agreement.

43.     Sellers have suffered damages as a result of Buyer's breach of the Purchase Agreement and Amended Agreement.

44.     All conditions precedent have occurred or have otherwise been waived.

WHEREFORE, Sellers respectfully request that this Court enter a judgment against Buyer for damages, cost and attorneys' fees and for any other relief this Court deems appropriate under the circumstances.

Respectfully submitted.

NASON, YEAGER, GERSON, WHITE & LIOCE, P.A.
1645 Palm Beach Lakes Boulevard, Suite 1200
West Palm Beach, Florida 33401
Telephone:      (561) 686-3307
Facsimile:      (561) 656-6547
E-mail:         nnason@nasonyeager.com
Attorneys for Plaintiffs

By: _____
    NATHAN E. NASON
    Florida Bar No. 511218

By: _____
    JOHN D. FOSTER
    Florida Bar No.: 518441

*EXECUTION COPY*

ASSET PURCHASE AGREEMENT

DATED FEBRUARY 21, 2008

BETWEEN

BRIGHT HOUSE NETWORKS, LLC

AS BUYER

AND

CENTURY COMMUNICATIONS OF FLORIDA, INC.
CENTURY DANIEL'S LANDING, LLC
CENTURY FALCON PARC, LLC
CENTURY FALCON PINES, LLC
CENTURY HAMMOCKS, LLC
CENTURY INDEPENDENCE, LLC
CENTURY LIVE OAK PRESERVE, LLC
CENTURY SAVANNAH PINES, LLC
CENTURY SAVANNAH LANDING, LLC
CENTURY VICTORIA PINES LANDING, LLC

AS SELLERS

AND

ARTHUR FALCONE, AS TRUSTEE OF ARTHUR FALCONE AMENDED AND RESTATED
REVOCABLE LIVING TRUST AGREEMENT, DATED NOVEMBER 4, 2005
ROBERT J. FALCONE, AS TRUSTEE OF THE ROBERT J. FALCONE REVOCABLE LIVING
TRUST, DATED SEPTEMBER 1, 1993, AS AMENDED BY THAT CERTAIN FIRST
AMENDMENT DATED AS OF SEPTEMBER 10, 1997, AS AMENDED BY THAT CERTAIN
FIRST AMENDMENT DATED APRIL 30, 2004
EDWARD FALCONE
NEIL EISNER

AS GUARANTORS



196532-v6

## TABLE OF CONTENTS

Page

ARTICLE 1 CERTAIN DEFINITIONS .................................................. 2

| | | |
|---|---|---|
| 1.1. | Defined Terms ................................................ | 2 |
| 1.2. | Additional Definitions................................. | 8 |
| 1.3. | Rules of Construction .................................. | 9 |

ARTICLE 2 PURCHASE AND SALE.................................................. 9

| | | |
|---|---|---|
| 2.1. | Covenant of Purchase and Sale; Assets........................... | 9 |
| 2.2. | Excluded Assets..................................................... | 10 |
| 2.3. | Assumed Obligations and Liabilities............................ | 10 |
| 2.4. | Purchase Price; Escrow Deposit .................................. | 11 |
| 2.5. | Adjustment Amount ................................................. | 12 |
| 2.6. | Adjustment Amount Calculated................................... | 13 |
| 2.7. | Allocation of Purchase Price...................................... | 14 |

ARTICLE 3 SELLERS' AND GUARANTORS' REPRESENTATIONS AND
WARRANTIES........................................................................ 14

| | | |
|---|---|---|
| 3.1. | Organization of Sellers ............................................. | 15 |
| 3.2. | Authority............................................................... | 15 |
| 3.3. | No Conflict; Required Consents................................... | 15 |
| 3.4. | Systems Information ................................................ | 15 |
| 3.5. | Title and Condition of Personal Property....................... | 16 |
| 3.6. | Franchises, Licenses and Contracts. ............................ | 16 |
| 3.7. | Litigation.............................................................. | 17 |
| 3.8. | Employment Matters ............................................... | 18 |
| 3.9. | Taxes ................................................................... | 18 |
| 3.10. | No Material Adverse Change ...................................... | 18 |
| 3.11. | Compliance with Legal Requirements. .......................... | 18 |
| 3.12. | Environmental Laws and Regulations ........................... | 20 |
| 3.13. | Real Property......................................................... | 20 |
| 3.14. | Non-Infringement.................................................... | 20 |
| 3.15. | Tradenames ........................................................... | 20 |
| 3.16. | Books and Records.................................................. | 20 |
| 3.17. | Accounts Receivable ............................................... | 20 |
| 3.18. | Bonds ................................................................... | 21 |
| 3.19. | No Rights of First Refusal ......................................... | 21 |
| 3.20. | Finders and Brokers................................................. | 21 |
| 3.21. | Accuracy of Schedules............................................. | 21 |
| 3.22. | No Misrepresentation .............................................. | 21 |

3.23.     Taxpayer Identification Number ...................................21
3.24.     Guarantors Net Worth ...............................................21
3.25.     Guarantors' Representations......................................22

ARTICLE 4 BUYER'S REPRESENTATIONS AND WARRANTIES ..........22

4.1.      Organization and Qualification of Buyer .......................22
4.2.      Authority.................................................................22
4.3.      No Conflict; Required Consents ...................................23
4.4.      Taxpayer Identification Number ...................................23
4.5.      Finders and Brokers...................................................23

ARTICLE 5 COVENANTS ...............................................................23

5.1.      Certain Affirmative Covenants of Sellers ........................23
5.2,      Certain Negative Covenants of Sellers............................24
5.3.      Bulk Sales ...............................................................24
5.4.      Taxes .....................................................................24
5.5.      Consents .................................................................25
5.6.      Estoppel Certificates .................................................25
5.7.      Joint Communications ...............................................25
5.8.      Changes in Condition ................................................25
5.9.      Financial Information.................................................25
5.10.     Employees of the Systems..........................................25
5.11.     Cooperation in the Obtaining of Consents.....................25
5.12.     Transitional Services and Use of Headend Equipment....26
5.13.     Capital Leases .........................................................26
5.14.     Use of Names and Logos ...........................................26
5.15.     Supplements to Schedules..........................................27
5.16.     Notification of Certain Matters ...................................27
5.17.     Commercially Reasonable Efforts ................................27
5.18.     Post-Closing Access to Personnel Records.....................27
5.19.     Confidentiality .........................................................28
5.20.     Programming Deletions...............................................28
5.21.     Open Video Licenses .................................................28
5.22.     Falcon Parc .............................................................28

ARTICLE 6 FIRST OFFER RIGHTS ..................................................29

ARTICLE 7 CONDITIONS PRECEDENT...............................................30

7.1.      Conditions to Buyer's Obligations ...............................30
7.2.      Conditions to Sellers' Obligations................................33
7.3.      Failure of Condition Precedent ....................................33

Error! Unknown document property name.         ii

ARTICLE 8 CLOSING ....................................................................34

8.1.    Closing; Time and Place..............................................34
8.2.    Sellers' Obligations ....................................................34
8.3.    Buyer's Obligations ....................................................35

ARTICLE 9 TERMINATION AND DEFAULT.......................................35

9.1.    Termination Events ....................................................35
9.2.    Effect of Termination ..................................................36

ARTICLE 10 INDEMNIFICATION .....................................................36

10.1.   Indemnification by Sellers ..........................................36
10.2.   Indemnification by Buyer............................................37
10.3.   Claims for Indemnity; Third Party Claims. ...................38
10.4.   Survival of Representations, Warranties and
        Covenants ...............................................................39

ARTICLE 11 MISCELLANEOUS PROVISIONS....................................39

11.1.   Expenses.................................................................39
11.2.   Waivers ...................................................................39
11.3.   Notices....................................................................39
11.4.   Publicity...................................................................42
11.5.   Risk of Loss.............................................................42
11.6.   Binding Effect; Benefits; Assignment............................42
11.7.   Entire Agreement; Amendments ...................................43
11.8.   Governing Law..........................................................43
11.9.   Counterparts ............................................................43
11.10.  Further Assurances....................................................43
11.11.  Collection of Accounts................................................43
11.12.  Attorneys' Fees .........................................................43
11.13.  Schedules, Appendices and Exhibits; Headings.............43
11.14.  Remedies Cumulative .................................................44
11.15.  Guaranty..................................................................44

## LIST OF APPENDICES, SCHEDULES AND EXHIBITS

Appendices

| | |
|---|---|
| Appendix A | Communities |
| Appendix B | Bulk Service Agreements |

Schedules

| | |
|---|---|
| Schedule 2.2 | Excluded Assets |
| Schedule 3.3 | Conflicts; Consents |
| Schedule 3.4 | Systems Information |
| Schedule 3.5 | Personal Property |
| Schedule 3.6 | Licenses and Contracts |
| Schedule 3.7 | Litigation |
| Schedule 3.9 | Taxes |
| Schedule 3.10 | Material Adverse Changes |
| Schedule 3.11 | Legal Requirements |
| Schedule 3.13 | Real Property |
| Schedule 3.15 | Seller's Tradenames and Trademarks |
| Schedule 3.18 | Bonds |
| Schedule 3.19 | First Refusal Rights |
| Schedule 4.3 | Buyer's Consents |

Exhibits

| | |
|---|---|
| Exhibit A | Form of Transition Services Agreement |
| Exhibit B | Form of Bill of Sale and Assignment |
| Exhibit C | Form of Opinion of Sellers' and Guarantors' Counsel |
| Exhibit D | Form of Sellers' Notice |
| Exhibit E | Form of Estoppel Certificate |
| Exhibit F | Form of Escrow Agreement |

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "Agreement") is entered into as of February 21, 2008, by and among Bright House Networks, LLC, a Delaware limited liability company, whose U.S. Taxpayer Identification Number is 02-0636401 ("Buyer"), and Century Daniel's Landing, LLC, a Florida limited liability company, whose U.S. Taxpayer Identification Number is 34-1975087 ("Daniels"), Century Falcon Parc, LLC, a Florida limited liability company, whose U.S. Taxpayer Identification Number is 20-2601518 ("Falcon Parc"), Century Falcon Pines, LLC, a Florida limited liability company, whose U.S. Taxpayer Identification Number is 20-4964015 ("Falcon Pines"), Century Hammocks, LLC, a Florida limited liability company, whose U.S. Taxpayer Identification Number is 20-2228674 ("Hammocks"), Century Independence, LLC, a Florida limited liability company, whose U.S. Taxpayer Identification Number is 20-0133114 ("Independence"), Century Live Oak Preserve, LLC, a Florida limited liability company, whose U.S. Taxpayer Identification Number is 34-1975143 ("Live Oak"), Century Savannah Pines, LLC, a Florida limited liability company, whose U.S. Taxpayer Identification Number is 20-2228920 ("Savannah Pines"), Century Savannah Landing, LLC, a Florida limited liability company, whose U.S. Taxpayer Identification Number is 20-2228867 ("Savannah Landing"), Century Victoria Pines Landing, LLC, a Florida limited liability company, whose U.S. Taxpayer Identification Number is 20-2228967 ("Victorian Pines" and collectively with Daniels, Falcon Parc, Falcon Pines, Hammocks, Independence, Live Oak, Savannah Pines and Savannah Landing, the "Limited Liability Companies") and Century Communications of Florida, Inc., a Florida corporation, whose U.S. Taxpayer Identification Number is 65-0854399 ("Managing Member" and collectively with the Limited Liability Companies, "Sellers" and each individually, a "Seller") and Arthur Falcone, as Trustee of the Arthur Falcone Amended and Restated Revocable Living Trust Agreement, dated November 4, 2005, Robert J. Falcone, as Trustee of the Robert J. Falcone Revocable Living Trust, dated September 1, 1993, as amended by that certain First Amendment dated as of September 10, 1997, as amended by that certain First Amendment dated April 30, 2004, Edward Falcone, an individual residing at 8 South Lake Trail, Palm Beach, Florida 33480, and Neil Eisner, an individual residing at 279 Key Palm Road, Boca Raton, Florida 33432 (collectively, the "Guarantors" and each individually, a "Guarantor").

### RECITAL

The Limited Liability Companies own and operate certain cable television systems (the "Systems") within the communities listed on Appendix A hereto (the "Communities").

Sellers have agreements currently in effect for the provision of cable television and other services to each of the Communities on a bulk basis as described on Appendix B hereto (the "Bulk Service Agreements").

Buyer owns and operates cable television systems and provides cable television services, high speed internet services and telephony services in the Counties in Florida in which the Communities are located.

Managing Member is the managing member of each of the Limited Liability Companies.

Buyer desires to purchase, and Sellers desire to sell to Buyer, substantially all of the assets of Sellers used or useful in connection with the operation of the Systems as more particularly described in this Agreement.

The Bulk Service Agreement held by Falcon Parc (the "Falcon Parc Bulk Service Agreement") for the 394-unit apartment complex commonly known as the Falcon Moss Apartments, as more fully described on Exhibit A to the Falcon Parc Bulk Service Agreement ("Falcon Moss Apartments"), is presently on a month-to-month basis, and the home owners association for this community has sought competitive bids from other service providers including Buyer. In light of such competitive bidding, delivery of the Falcon Parc Bulk Service Agreement is not a closing condition to this Agreement, however, if Sellers do not deliver the Bulk Service Agreement for the Falcon Moss Apartments, and such agreement is not acquired by Buyer through competitive bidding prior to the Closing Date (as defined herein), then the purchase price for the Systems shall be adjusted as provided for herein.

As a condition to Buyer's purchase of the Systems, Buyer requires the Guarantors to guarantee the obligations of Sellers under this Agreement, and each of the Guarantors have each agreed to guaranty the obligations of Sellers under this Agreement.

## AGREEMENTS

In consideration of the mutual covenants and promises set forth herein, Buyer and Sellers agree as follows:

## ARTICLE 1
## CERTAIN DEFINITIONS

1.1.  Defined Terms.  As used in this Agreement, the following terms, whether in singular or plural form, shall have the following meanings:

Error! Unknown document property name.          2

"Accounts Receivable" means the rights of Sellers to payment for Services rendered by Sellers prior to the Adjustment Time in connection with the operation of the Systems as reflected on the billing records of Sellers.

"Adjustment Time" means 11:59 p.m., Eastern Time, on the Closing Date.

"Affiliate" means (a) with respect to any specified Person, a Person that directly, or indirectly through one or more intermediaries, is controlling, or controlled by, or under common control with, the Person specified, and (b) with respect to a specified individual, each other member of such individual's Family, any Person that is directly or indirectly controlled by such individual or one or more members of such individual's Family and any Person with respect to which such individual or one or more members of such individual's Family serves as a director, officer, partner, member, executor or trustee (or in a similar capacity). For purposes of this definition, the "Family" of an individual includes (i) the individual, (ii) the individual's spouse and former spouses, (iii) any other natural person who is related to the individual or the individual's spouse within the second degree, and (iv) any other natural person who resides with such individual.

"Assumed Contracts" means (i) all Contracts listed on Schedule 3.6 and not also listed on Schedule 2.2 or otherwise of the kind described in Section 2.2 hereof; (ii) any Contracts entered into by Sellers between the date hereof and the Closing Date in compliance with the terms of this Agreement and which Buyer agrees to assume.

"Cable Act" means Title VI of the Communications Act of 1934, 47 U.S.C. §151 *et seq.*

"Cable Service" means multi-channel video programming (both analog and digital), delivered through any form of Cable System now or hereafter in existence.

"Cable System" means a facility, consisting of a set of closed transmission paths and associated signal generation, reception and control equipment that is designed to provide Services which includes Cable Service and which is provided to multiple subscribers within a community and which may include, without limitation, multi-point distribution systems, multi-channel multi-point distribution systems, wireless cable systems and satellite master antenna systems.

"CARS" means Cable Television System Relay Service.

"Code" means the Internal Revenue Code of 1986, as amended.

"Consents" means all of the consents, permits, approvals or releases of third parties, including Governmental Authorities (if any), property owners, homeowner associations, lessors and other Persons, necessary to transfer the Assets to Buyer, to allow Buyer to own and operate the Assets, or otherwise to consummate lawfully the transactions contemplated hereby, including any consents required to transfer to Buyer those Assumed Contracts to which entities other than the Sellers are parties.

"Contracts" means the Bulk Service Agreements and all other leases, private easements, private rights-of-way, multiple dwelling unit agreements, retransmission consent agreements, must carry notifications, pole attachment and conduit agreements, subscriber agreements and other agreements, written or oral (including any amendments and other modifications thereto) relating to the business or operations of the Systems, and (i) which are in effect on the date hereof and which by their terms are to be in effect as of the Closing Date, or (ii) which are entered into by Sellers in the ordinary course of business and as permitted by this Agreement between the date of this Agreement and the Closing Date and which by their terms are to be in effect as of the Closing Date.

"Environmental Laws" means all Federal, State, or local laws, rules, regulations, ordinances, or codes, or common law, relating to the pollution or protection of the environment or human health and safety.

"ERISA" means the Employee Retirement Income Security Act of 1974.

"FCC" means the Federal Communications Commission.

"Franchises" means all municipal and county franchises, franchise applications (if any), authorizations, ordinances and permits relating to any of the Systems, other than the Licenses and any other franchises held by a Seller or any of their Affiliates to provide Cable Service within the Counties.

"Governmental Authority" means the United States of America, any state, commonwealth, territory or possession thereof and any political subdivision or quasi-governmental authority of any of the same and any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

"Hazardous Substances" means all substances, materials or wastes regulated under any Environmental Law or otherwise hazardous to the environment or human health, including, without limitation, asbestos, petroleum, mold and polychlorinated biphenyls.

"Headend Equipment" means certain equipment owned or leased by Sellers or which Sellers otherwise have the right to use by which incoming signals are received, amplified, converted, processed and combined into a common cable for transmission to customers, including antennas, preamplifiers, frequency converters, demodulators, modulators, processors and other related equipment.

"Internet Service" means conventional and high-speed digital data communication capabilities and other interconnectivity with the Internet, including ISP services and transportation of and access to other ISP products, whether delivered through cable, DSL, wireless or otherwise.  Internet Service does not include Telephony Service.

"Judgment" means any judgment, writ, order, injunction, award or decree of any court, judge, justice or magistrate, including any bankruptcy court or judge, and any order of or by any Governmental Authority.

"Knowledge" or "knowledge" - an individual will be deemed to have "Knowledge" or "Know" of a particular fact or other matter if:

(a)    such individual is actually aware of such fact or other matter; or

(b)    a prudent individual could be expected to discover or otherwise become aware of such fact or other matter in the course of conducting a reasonably comprehensive investigation concerning the existence of such fact or other matter and the undertaking of such inquiry shall be implied in every case in which a qualification as to "Knowledge" is taken in this Agreement.

A Person (other than an individual) will be deemed to have "Knowledge" of a particular fact or other matter if any individual who is serving, or who has at any time served, as a director, officer, manager, member, partner, executor or trustee of such Person, including a system manager (or in any similar capacity) has, or at any time had, Knowledge of such fact or other matter.

"Legal Requirements" means applicable common law and any statute, ordinance, code or other law, rule, regulation, order, technical or other standard, requirement or procedure enacted, adopted, promulgated, applied or followed by any Governmental Authority, including Judgments.

"Licenses" means all domestic satellite, business radio, CARS, microwave and other licenses, and all authorizations and permits relating to

any of the Systems granted to a Seller by any Governmental Authority, except the Franchises or any public easements or rights-of-way related thereto.

"Lien" means any security agreement, financing statement filed with any Governmental Authority, conditional sale or other title retention agreement, any lease, consignment or bailment given for purposes of security, any lien, mortgage, indenture, pledge, option, encumbrance, adverse interest, constructive trust or other trust, claim, attachment, exception to or defect in title or other ownership interest of any kind, which otherwise constitutes an interest in or claim against property, whether arising pursuant to any Legal Requirement, Contract or otherwise.

"Litigation" means any claim, action, suit, proceeding, arbitration, investigation, hearing or other activity or procedure that could result in a Judgment, and any notice of any of the foregoing.

"Losses" means any claims, losses, liabilities, damages, Liens, penalties, costs, and expenses, including interest which may be imposed in connection therewith, expenses of investigation, reasonable fees and disbursements of counsel and other experts, and the cost to any Person making a claim or seeking indemnification under this Agreement with respect to funds expended by such Person by reason of the occurrence of any event with respect to which indemnification is sought.

"Material Adverse Change" means, as applied to any Person, any material adverse change in such Person's business, operations, properties or assets, and, as applied to any System, any material adverse change in such System's business, operations, properties or assets, including, without limitation, any event which causes or is likely to cause a material reduction in the number of subscribers or otherwise have a material impact on the System's revenues or profits, or which limits in anyway the enforceability of any provisions of any of the Bulk Service Agreements.

"Past Due" means the number of days a customer or bulk account is "past due" starting from the day that the bill becomes due.

"Permitted Lien" means any (i) Lien securing Taxes, assessments and governmental charges not yet due and payable or being contested in good faith (and for which adequate accruals or reserves have been established), (ii) customary zoning law or ordinance or any similar Legal Requirement, (iii) customary right reserved to any Governmental Authority to regulate the affected property, and (iv) any inchoate materialmen's, mechanic's, workmen's, repairmen's or other like Liens arising in the ordinary course of business; provided that "Permitted Lien" shall not include any Lien securing a debt or claim which could prevent or interfere with the conduct of the business of the

affected System as it is currently being conducted. Classification of any Lien as a "Permitted Lien" shall not affect any liability that Sellers may otherwise have under this Agreement, including pursuant to any indemnity obligation under this Agreement.

"Person" means any natural person, Governmental Authority, corporation, general or limited partnership, limited liability company, joint venture, trust, association or unincorporated entity of any kind.

"Personal Property" means all of the equipment, plant, inventory, vehicles, spare parts, supplies and other tangible personal property which are owned or leased by Sellers and used or useful as of the date hereof in the conduct of the business or operations of the Systems, other than the Excluded Assets, plus such additions thereto and deletions therefrom arising in the ordinary course of business and as permitted by this Agreement between the date of this Agreement and the Closing Date as more particularly described on Schedule 3.5.

"Real Property" means all of the fee estates and buildings and other improvements thereon, leasehold interests in real estate, private easements, private rights to access, private rights-of-way, and other real property interests that are owned or leased by Sellers and used or useful, as of the date of this Agreement, in the conduct of the business or operations of the Systems, plus such additions thereto and deletions therefrom arising in the ordinary course of business and permitted by this Agreement between the date of this Agreement and the Closing Date as more particularly described on Schedule 3.13.

"Security Service" means monitoring of the alarm system installed in a home and making calls to the home or police, as appropriate.

"Sellers' Knowledge" means the Knowledge of Robert Falcone, President of the Managing Member.

"Services" means collectively Cable Service, Internet Service, Security Service and Telephony Service.

"Taxes" means all levies and assessments of any kind or nature imposed by any Governmental Authority, including all income, sales, use, communications services, *ad valorem*, value added, franchise, severance, net or gross proceeds, withholding, payroll, employment, excise, premium, stamp, transfer, license, occupation, unclaimed property or property taxes and levies, together with any interest thereon and any penalties, additions to tax or additional amounts applicable thereto.

"Telephony Service" means (1) a telecommunications service, which is the offering of telecommunications for a fee directly to the public, or to such classes of users as to be effectively available directly to the public, regardless of the facilities used; or (2) voice over Internet Protocol ("VOIP") service that enables real-time, two-way voice communications, requires a broadband connection from the location of the called or calling party, requires IP-compatible customer premises equipment, and permits users generally to receive calls that originate on the public switched telephone network ("PSTN") and to terminate calls to the PSTN, or such other services as the FCC may determine to be VOIP information or telecommunication services.

"Transaction Documents" means all instruments and documents executed and delivered by Buyer, Sellers, or any officer, director or affiliate of either of them, in connection with this Agreement or the transactions contemplated hereby.

"Unit" means an individual dwelling unit that receives and Cable Service (with or without other Services) from the Systems.

1.2.   Additional Definitions.  The following is a list of additional terms used in this Agreement and a reference to the Section hereof in which such term is defined:

| Term | Section |
| --- | --- |
| Adjustment Amount | 2.5 |
| Agreement | Initial Paragraph |
| Assets | 2.1 |
| Assumed Obligations and Liabilities | 2.3 |
| Bulk Service Agreements | Preamble |
| Buyer | Preamble |
| Claims | 2.4(b) |
| CLI | 3.11(c) |
| Closing | 8.1 |
| Closing Date | 8.1 |
| Closing Date Payment | 2.4(a) |
| Confidential Information | 5.19 |
| Digital Programming Services Agreement | 7.1(d) |
| EchoStar | 7.1(d) |
| Escrow Account | 2.4(b) |
| Escrow Agent | 2.4(b) |
| Escrow Agreement | 2.4(b) |
| Escrow Amount | 2.4(b) |
| Escrow Release Date | 2.4(c) |
| Estoppel Certificates | 5.6 |

| | |
|---|---|
| Excluded Assets | 2.2 |
| Exclusive Negotiation Period | Article 6 |
| Falcon Moss Apartments | Preamble |
| Falcon Parc Bulk Service Agreement | Preamble |
| GAAP | 2.5(b) |
| Guarantors | Recital |
| Holdback Amount | 2.4(a) |
| Initial Adjustment Certificate | 2.6 |
| Managing Member | Initial Paragraph |
| Marlin Agreement | 7.1(n) |
| Minimum Number of Units | 2.5(c) |
| Outside Closing Date | 8.1 |
| Owned Real Property | 3.13 |
| Primary Business | Article 6 |
| Purchase Price | 2.4 |
| Qualified Auditor | 2.6 |
| Sellers | Preamble |
| Sellers' Notice | Article 6 |
| Systems | Recital |
| Trinchini Agreement | 7.1(m) |
| Unit Shortfall | 2.5(c) |
| Unit Test Date | 2.5(c) |

1.3.  <u>Rules of Construction</u>. Unless otherwise expressly provided in this Agreement, (i) accounting terms used in this Agreement shall have the meaning ascribed to them under GAAP; (ii) words used in this Agreement, regardless of the gender used, shall be deemed and construed to include any other gender, masculine, feminine, or neuter, as the context requires; (iii) the word "including" is not limiting, and the word "or" is not exclusive; (iv) the capitalized term "Section" refers to sections of this Agreement; (v) references to a particular Section include all subsections thereof, (vi) references to a particular statute or regulation include all amendments thereto, rules and regulations thereunder and any successor statute, rule or regulation, or published clarifications or interpretations with respect thereto, in each case as from time to time in effect; (vii) references to a Person include such Person's successors and assigns to the extent not prohibited by this Agreement; and (viii) references to a "day" or number of "days" (without the explicit qualification "business") shall be interpreted as a reference to a calendar day or number of calendar days.

**ARTICLE 2**
**PURCHASE AND SALE**

2.1.  <u>Covenant of Purchase and Sale; Assets</u>. Subject to the terms and conditions set forth in this Agreement, at Closing, Sellers shall transfer to Buyer, and Buyer shall acquire from Sellers, free and clear of all Liens (except

Permitted Liens), the following described assets and properties, tangible and intangible, used by or useful to Sellers in their operation of, or otherwise relating to, the Systems, other than the assets excluded under Section 2.2 below (the "Assets"):

     (a)   the Personal Property;

     (b)   the Real Property;

     (c)   the Assumed Contracts;

     (d)   the Accounts Receivable;

     (e)   the Licenses;

     (f)   all of Sellers' technical information and data, customer lists, machinery and equipment warranties, maps, computer disks and tapes, plans, diagrams, blueprints and schematics relating to the Systems, including filings with the FCC, other than as any of the foregoing relate to the Excluded Assets;

     (g)   all books and records relating to the business or operations of the Systems, including executed copies of the Assumed Contracts, subject to the right of Sellers to have such books and records made available to Sellers for a reasonable period, not to exceed three (3) years from the Closing Date.

    2.2.   Excluded Assets.  Notwithstanding the provisions of Section 2.1, the Assets shall not include the following, which shall be retained by Sellers (the "Excluded Assets"): (i) programming agreements; (ii) fiber optic and other bandwidth provider agreements; (iii) insurance policies and rights and claims thereunder; (iv) bonds, letters of credit, surety instruments, and other similar items; (v) cash and cash equivalents; (vi) Sellers' trademarks, trade names, service marks, service names, logos, and similar proprietary rights (subject to Section 5.14); (vii) all claims, rights and interests in and to any refunds for Taxes or fees, including franchising and copyright fees, for periods prior to the Closing Date; (viii) Franchises, if any; (ix) all Headend Equipment (subject to Section 5.12); (x) retransmission consent agreements relating to the Systems; (xi) employee benefit plans of any nature and their assets; (xii) rights of Sellers under any Contract for subscriber billing services and any leased subscriber billing equipment; and (xiii) the additional rights, assets, and properties described on Schedule 2.2.

    2.3.   Assumed Obligations and Liabilities.  After the Adjustment Time, Buyer shall assume, pay, discharge and perform the following (the "Assumed Obligations and Liabilities"): (i) those obligations and liabilities attributable to periods after the Adjustment Time under the Assumed Contracts; (ii) those obligations and liabilities of Sellers that Buyer elects to assume at Closing only

to the extent that there shall be an adjustment in favor of Buyer with respect thereto pursuant to Section 2.5; and (iii) all other obligations and liabilities arising out of Buyer's ownership of the Assets or operation of the Systems after the Adjustment Time. All obligations and liabilities arising out of or relating to the Assets or the Systems other than the Assumed Obligations and Liabilities shall remain and be the obligations and liabilities solely of Sellers.

2.4.   Purchase Price; Escrow Deposit.   Subject to Section 2.5 below, Buyer shall pay to Sellers Ten Million Nine Hundred Thousand Dollars ($10,900,000) as consideration for the Assets (the "Purchase Price").

(a)   Closing Date Payment.   The sum of Nine Million Eight Hundred Thousand Dollars ($9,800,000) (the "Closing Date Payment") shall be payable to Sellers on the Closing Date by wire transfer of immediately available funds to the account designated by the Managing Member in writing at least three (3) business days prior to the Closing Date.

(b)   Escrow Deposit.   Concurrently with the payment of the Closing Date Payment, Buyer shall deliver a cash deposit in the amount of One Million One Hundred Thousand Dollars ($1,100,000) (the "Escrow Amount") to JPMorgan Chase Bank, N.A. (the "Escrow Agent") to be held in escrow to act, for a period of one (1) year following the Closing (or such later time in respect of claims for which Buyer has provided written notice to Sellers and the Escrow Agent during such one-year period), as security for any Liabilities in respect of any matter for which indemnification may be sought by Buyer pursuant to Section 10.1 hereof. The Escrow Amount and the interest thereon shall be held in an account (the "Escrow Account") and released pursuant to the terms of that certain Escrow Agreement, substantially in the form attached hereto as Exhibit F (the "Escrow Agreement"), to be executed by Buyer, Managing Member and Escrow Agent concurrently with the execution and delivery of this Agreement by Sellers and Buyer.   The Escrow Amount will be invested as provided in the Escrow Agreement and disbursed in accordance with the Escrow Agreement and Section 2.4(c) below. Buyer and Seller shall share equally the cost of establishing and maintaining the Escrow Account. Until such time as the funds in the Escrow Account are released to Sellers such funds shall be deemed to be solely the property of Buyer or, in the alternative, Sellers hereby grant to Buyer a first priority security interest in such funds.

(c)   Escrow Release. In accordance with the Escrow Agreement, within three (3) Business Days following the first anniversary of the Closing Date (the "Escrow Release Date"), Buyer and the Managing Member shall jointly instruct the Escrow Agent to deliver to Sellers, by wire transfer of immediately available funds, all amounts then remaining in the Escrow Account other than the amount required to be retained in respect of any outstanding claims (and interest attributable to such amount) for which Buyer

has submitted written notice to the Managing Member and the Escrow Agent prior to the first anniversary of the Closing Date. In accordance with the Escrow Agreement, promptly upon the resolution of all such claims, Buyer and Seller shall jointly instruct the Escrow Agent to release to Buyer the amount required to satisfy such claims (and interest attributable to such amount) and to Sellers that portion of the amounts remaining in the Escrow Account not required to satisfy such claims (and interest attributable to such amounts). The Escrow Amount shall not constitute the limit of Sellers' liability to Buyer, and Buyer shall retain all rights and remedies against Sellers under this Agreement, including Buyer's indemnification rights pursuant to <u>Article 10</u> of this Agreement.

2.5.  <u>Adjustment Amount</u>.  Buyer or Sellers, as appropriate, shall pay to the other the net amount of the adjustments and prorations effected pursuant to this <u>Section 2.5</u> (the "<u>Adjustment Amount</u>").

(a)  <u>Advance Payments and Deposits</u>.  Buyer shall be entitled to an amount equal to the aggregate of (i) all deposits of subscribers of the Systems for converters, decoders, and similar items, and (ii) all payments made to Sellers for (A) services to be rendered by Buyer to subscribers of the Systems after the Adjustment Time and (B) other services to be rendered by Buyer to other third parties after the Adjustment Time for services or rentals, to the extent that the obligations of Sellers relating thereto are assumed by Buyer at Closing.

(b)  <u>Expenses</u>.  As of the Adjustment Time, the following expenses shall be prorated, in accordance with generally accepted accounting principles consistently applied in the United States ("<u>GAAP</u>"), so that all expenses for periods prior to the Adjustment Time shall be for the account of Sellers, and all expenses for periods after the Adjustment Time shall be for the account of Buyer:

(i)  all payments and charges under the Assumed Contracts;

(ii)  general property Taxes, special assessments, and ad valorem Taxes levied or assessed against any of the Assets;

(iii)  charges for utilities and other goods or services furnished to the Systems;

(iv)  copyright expenses; and

(v)  all other items of expense relating to the Systems, excluding Taxes (except Taxes described in (ii) above);

provided, however, that Sellers and Buyer shall not prorate any items of expense payable under any Excluded Assets, all of which shall remain and be solely for the account of Sellers.

      (c)    Unit Adjustment. The Purchase Price shall be decreased by the dollar amount equal to (i) the Unit Shortfall, if any, multiplied by (ii) Four Thousand and One Dollars ($4,001) except that if Sellers fail to cause the Falcon Parc Bulk Service Agreement to be assigned to Buyer at Closing, then the first two hundred (200) Units of any Unit Shortfall shall be multiplied by One Thousand Dollars ($1,000) and the remaining Units, if any, of the Unit Shortfall shall be multiplied by Four Thousand and One Dollars ($4,001). For purposes of this Agreement, the "Unit Shortfall" equals the number, if any, by which the total number of Units served by the Systems as of the most recent month-end that is at least thirty (30) days prior to Closing (the "Unit Test Date") is less than Two Thousand Eight Hundred Seventy-Four (2,874) Units (the "Minimum Number of Units"). Notwithstanding the foregoing, if prior to the Closing Date, Buyer is awarded a bulk service agreement for the Falcon Moss Apartments through the competitive bidding process, then (a) the Falcon Moss Apartments shall be disregarded for purpose of determining the Unit Adjustment, (b) the Minimum Number of Units shall be reduced to Two Thousand Six Hundred Seventy-Four (2,674) Units and (c) The Purchase Price shall be decreased by the dollar amount equal to (x) the Unit Shortfall, if any, multiplied by (y) Four Thousand and One Dollars ($4,001). For the avoidance of doubt, except in the case of the Falcon Moss Apartments, the Unit Shortfall adjustment is not a substitute for Sellers' obligation to assign each of the Bulk Service Agreements to Buyer and deliver the Estoppel Certificates required by Section 7.1(g) hereof for each Bulk Service Agreement as a condition to Closing, and Buyer shall not be obligated to close unless Sellers satisfy such conditions.

      (d)    Accounts Receivable. The Purchase Price shall be increased by the dollar amount equal to the sum of (a) the face amount of all Eligible Subscriber Accounts Receivable that are current or thirty (30) days or less Past Due as of the Adjustment Time, (b) ninety percent (90%) of the face amount of all Eligible Subscriber Accounts Receivable that are more than thirty (30) days but fewer than two (2) monthly billing cycles (not to exceed sixty-two (62) days) Past Due as of the Adjustment Time, and (c) zero percent (0%) of the face amount of all Eligible Subscriber Accounts Receivable that are more than two (2) monthly billing cycles Past Due as of the Adjustment Time. "Eligible Subscriber Accounts Receivable" shall mean accounts receivable resulting from the provision of Services by the Systems to subscribers prior to the Adjustment Time.

      2.6.  Adjustment Amount Calculated. The Adjustment Amount shall be estimated in good faith by Managing Member, and set forth, together with a

detailed statement of the calculation thereof, in a certificate (the "Initial Adjustment Certificate") executed by an officer of Managing Member and delivered to Buyer, together with such documentation as is reasonably necessary or required by Buyer to support the amount of the Adjustment Amount, not later than five (5) business days prior to Closing. The Initial Adjustment Certificate, unless objected to by Buyer at least two (2) business days prior to Closing, shall constitute the basis on which the Adjustment Amount is calculated for purposes of Closing. At Closing, the party against whose favor the estimated Adjustment Amount is so determined shall pay to the other the estimated Adjustment Amount by way of adjustment to the Closing Date Payment. Buyer and Managing Member shall use good faith efforts to determine the actual Adjustment Amount within ninety (90) days after Closing. If Buyer and Managing Member are unable to agree on the actual Adjustment Amount within the period provided herein, the disputed portion of the Adjustment Amount shall be determined by Ernst & Young LLP (the "Qualified Auditor") and the determination of the Qualified Auditor shall be final and binding upon the parties. Buyer shall bear fifty percent (50%) and Managing Member shall bear fifty percent (50%) of the fees and expenses of the Qualified Auditor incurred in connection with making such determination. Not later than fifteen (15) days after the Managing Member and Buyer shall have finally agreed upon the actual Adjustment Amount, or the actual Adjustment Amount is determined by the Qualified Auditor, Sellers or Buyer, as appropriate, shall pay to the other an amount equal to the amount by which the Adjustment Amount as finally determined differs from the estimated Adjustment Amount paid at Closing, plus interest at the rate per annum publicly announced from time to time by JPMorgan Chase Bank as its prime rate.

2.7. Allocation of Purchase Price. Within sixty (60) days following the Closing Date, Buyer shall deliver to the Managing Member a schedule showing the allocation of the Purchase Price among the Assets prepared in accordance with Section 1060 of the Code and the Treasury Regulations promulgated thereunder. If Buyer and Sellers agree upon an allocation, they shall file all Tax returns and schedules thereto consistent with any agreed upon allocation, unless otherwise required by applicable Legal Requirements. In the event the parties do not reach agreement on the allocation, the parties shall reflect the Assets on their respective books for Tax reporting purposes in accordance with each such party's own determination of such allocation.

## ARTICLE 3
### SELLERS' AND GUARANTORS' REPRESENTATIONS AND WARRANTIES

Sellers jointly and severally represents and warrants to Buyer, as of the date of this Agreement and as of Closing, as follows:

Error! Unknown document property name.   14

3.1.  **Organization of Sellers**.  Each Seller is duly organized, validly existing, and in good standing under the laws of the State of Florida, and has all requisite power and authority to own and lease the properties and assets it currently owns and leases and to conduct its activities as such activities are currently conducted.

3.2.  **Authority**. Each Seller has all requisite corporate or limited liability company power and authority to execute, deliver, and perform this Agreement and to consummate the transactions contemplated hereby.  The execution, delivery, and performance of this Agreement and the consummation of the transactions contemplated hereby by Sellers have been duly and validly authorized by all necessary action on the part of Sellers, and this Agreement has been duly and validly executed and delivered by each Seller, and is the valid and binding obligation of Sellers, enforceable against Sellers in accordance with its terms.

3.3.  **No Conflict; Required Consents**.   The execution, delivery and performance by Sellers of this Agreement and the Transaction Documents do not and will not (i) conflict with or violate any provision of the organizational documents of Sellers; (ii) violate any provision of any Legal Requirements; (iii) upon receipt of the Consents set forth on Schedule 3.3, conflict with, violate, result in a breach of, constitute a default under (without regard to requirements of notice, lapse of time, or elections of other persons, or any combination thereof) or accelerate or permit the acceleration of the performance required by, any Contracts or Licenses to which any Seller is a party or by which any Seller or the Assets are bound or affected; (iv) result in the creation or imposition of any Lien against or upon any of the Assets other than a Permitted Lien; or (v) except as set forth on Schedule 3.3, require any consent, approval, or authorization of, or filing of any certificate, notice, application, report, or other document with, any Governmental Authority or other Person.

3.4.  **Systems Information**.  Schedule 3.4 sets forth, with respect to each System, a true and accurate description of the following information as of the date specified in such Schedule (which shall be no earlier than December 31, 2007):

(a)   the approximate number of miles of activated aerial and underground plant included in the Assets;

(b)   the approximate number of passings of each of the Systems;

(c)   a description of the Cable Service and all other services available from each of the Systems, the rates charged by Sellers for each,

together with the number of Units receiving each of the services and any other charges by Sellers for services to Units;

(d)   the name and address of any customer receiving free and/or discounted services from any of the Systems and a description of the services provided to each such customer;

(e)   the channel and megahertz capacity of each of the Systems, the stations and signals carried by the Systems, the channel position of each such signal and station and all frequencies utilized by the Systems;

(f)   with respect to each Bulk Service Agreement, the name and address of, and, if applicable, the number of Units in, each such establishment, building, condominium, hotel, motel or other dwelling or permanent residential site that is served by any of the Systems; and

(g)   with respect to each local broadcast signal carried by the Systems, a designation of whether such signal is carried pursuant to a must carry election under the Cable Act or a written retransmission consent agreement.]

A "passing" for purposes of this Section 3.4 shall mean a habitable dwelling or other residential unit that can be serviced by using no more than 200 feet of drop cable by any of the Systems.

3.5.   Title and Condition of Personal Property.   Schedule 3.5 contains a description of the Personal Property, other than the Excluded Assets, as of the date specified in such Schedule (which date shall be no earlier than December 31, 2007). Except as described on Schedule 3.5, Sellers own all right, title and interest in and to all of the Personal Property, free and clear of all Liens, except Permitted Liens. Except as described on Schedule 3.5, all of the Personal Property conforms in all material respects with all Legal Requirements and is in good working order and repair. The Personal Property comprises all of the tangible personal property necessary to conduct the business and operations of the Systems as now conducted other than the Excluded Assets.

3.6.   Franchises, Licenses and Contracts.

(a)   Appendix B sets forth a true and complete list of each of the Bulk Service Agreements, none of such agreements has been amended or modified in anyway since the date of such agreement as shown on Appendix B, and such agreements embody all the understanding and agreements between parties thereto concerning the provision of Services.

(b)   Sellers do not own or possess any rights under any Franchise;

(c)    Schedule 3.6 contains a description of all of the Licenses, and Contracts as of the date of this Agreement, except for: (i) subscription agreements with individual residential subscribers for the Services provided by the Systems in the ordinary course of business which may be canceled by any of the Systems without penalty on not more than thirty (30) days' notice; and (ii) miscellaneous service contracts terminable at will without penalty. Sellers have delivered to Buyer true and complete copies of each of the Licenses and written Contracts, including in each case any amendments thereto, other than Contracts described in clauses (i) and (ii) above and other than bank financing documents. Except as described on Schedule 3.6: (x) each of the Licenses and Contracts is valid, in full force and effect, and enforceable in all material respects in accordance with its terms against the parties thereto, and Sellers have fulfilled when due, or have taken all action necessary to enable them to fulfill when due, all of their material obligations thereunder; (y) there has not occurred any default (without regard to lapse of time, the giving of notice, the election of any Person other than a Seller, or any combination thereof) by any Seller nor, to the knowledge of any Seller, has there occurred any default (without regard to lapse of time, the giving of notice, the election of Sellers, or any combination thereof) by any Person other than Sellers under any of the Licenses or Contracts which could give rise to a claim for damages or other relief; and (z) no Seller nor, to the knowledge of any of Seller, any other Person has failed to perform or fulfill its material non-monetary obligations under any License or Contract or is past due in the payment of any monetary obligations thereunder (which, in the case of any customer or bulk account, means past the grace period before late charges would accrue), and no waiver or indulgence has been granted by any of the parties thereto.

(d)    Except as listed on Schedule 3.6, none of the Licenses or Contracts is held in any name other than the name of a Seller.

3.7.    Litigation. Except as described on Schedule 3.7, (i) there is no outstanding Judgment against any Seller requiring any Seller to take any action of any kind with respect to the Assets or the operation of any of the Systems, or to which any of the Systems or the Assets are subject or by which they are bound or affected; and (ii) there is no (nor during the past five years has there been any) Litigation pending, or, to any Seller's Knowledge, threatened, against any Seller which individually or in the aggregate might result in any materially adverse change in the financial condition or operation of the Systems or adversely affect the Assets or the ability of any Seller to perform its obligations under this Agreement.

3.8. <u>Employment Matters</u>. Sellers have never had direct employees, and all services performed for Sellers in respect of the Systems have been performed by persons provided to Sellers by an Affiliate of Sellers.

3.9. <u>Taxes</u>. Except as described on <u>Schedule 3.9</u>, (i) each Seller has duly and timely paid all Taxes with respect to the Systems and the Assets that have become due and payable by it; (ii) no Seller has received notice of, nor does any Seller have any knowledge of, any notice of deficiency or assessment of proposed deficiency or assessment from any taxing Governmental Authority with respect to the Systems; (iii) there are no audits pending with respect to the Systems and there are no outstanding agreements or waivers by any Seller that extend the statutory period of limitations applicable to any federal, state, local, or foreign tax returns or Taxes with respect to the Systems; (iv) none of the Assets is subject to any deficiency or assessment by any taxing Governmental Authority which has resulted, or could result, in a Lien on such Assets; and (v) each Seller has duly and timely filed in true and correct form all Tax returns and Tax reports required to be filed by such Seller.

3.10. <u>No Material Adverse Change</u>. Except as described on <u>Schedule 3.10</u>, since December 31, 2006, there has not been any Material Adverse Change in the business, operations, properties or assets, future prospects, or condition of the Systems and no event has occurred or circumstance exists (excluding events or circumstances resulting from general economic conditions or conditions within the cable industry known to the Buyer) that, in the reasonable opinion of Sellers, may result in such a Material Adverse Change.

3.11. <u>Compliance with Legal Requirements</u>.

(a) The operation of each of the Systems as currently conducted does not violate or infringe in any material respect any Legal Requirements currently in effect. Except as described on <u>Schedule 3.11</u>, no Seller has received notice of any violation by any Seller or any part of any of the Systems of any Legal Requirement applicable to the operation of the Systems as currently conducted, and Sellers know of no basis for the allegation of any such violation. No Seller is in default of or in violation with respect to any Judgment.

(b) Sellers are permitted under all applicable FCC rules, regulations and orders to distribute the transmissions of video programming or other information that Sellers make available to subscribers of the Systems and to utilize all carrier frequencies generated by the operations of the Systems, and are licensed to operate all the facilities required by law to be licensed, including any business radio and any cable television relay service system being operated as part of the Systems. Other than requests for network nonduplication and syndex protection and as described on <u>Schedule 3.11</u>, no

written requests have been received by Sellers during the three years preceding the date of this Agreement from the FCC, the United States Copyright Office or any other Person challenging or questioning the right of Sellers to operate any of the Systems and of any FCC-licensed or registered facility used in conjunction with Sellers' operation of the Systems.  Except as provided in Schedule 3.11, Sellers' operation of the Systems, and of any FCC-licensed or registered facility used in conjunction with Sellers' operation of the Systems, is in compliance in all material respects with the FCC's rules and regulations and the provisions of the Cable Act. Sellers have not violated any laws or any duty or obligation with regard to protecting the privacy rights of any past or present subscribers of the Systems.

(c)  Sellers have conducted all system and microwave performance tests and all Cumulative Leakage Index ("CLI") related tests applicable to the Systems. Sellers have (i) maintained appropriate log books and other record keeping which accurately and completely reflect in all material respects all results required to be shown thereon; (ii) to the extent required by the rules and regulations of the FCC, corrected any radiation leakage of the Systems required to be corrected in connection with Sellers' monitoring obligations under the rules and regulations of the FCC; and (iii) otherwise complied in all material respects with all applicable CLI rules and regulations in connection with the operation of the System.

(d)  Sellers have deposited with the United States Copyright Office all statements of account and other documents and instruments, and paid all royalties, supplemental royalties, fees and other sums to the United States Copyright Office required under the Copyright Act with respect to the business and operations of the Systems as are required to obtain, hold and maintain the compulsory copyright license for cable television Systems prescribed in Section 111 of the Copyright Act. Sellers are in compliance in all material respects with the Copyright Act and the rules and regulations of the Copyright Office with respect to the operation of the Systems.  Sellers are entitled to hold and does hold the compulsory copyright license described in Section 111 of the Copyright Act, which compulsory copyright license is in full force and effect and has not been revoked, canceled, encumbered or adversely affected in any manner.

(e)  All of the broadcast television signals carried by the Systems are carried either pursuant to the must-carry requirements or pursuant to written retransmission consent agreements.

(f)  There have been no complaints filed with the FCC and received by Sellers regarding cable programming services of the Systems.

(g)   The Systems are being operated in compliance with the Legal Requirements of the Federal Aviation Administration. <u>Schedule 3.11</u> lists all existing towers used in connection with the Systems, and Sellers have provided to Buyer copies of all tower registrations relating to the Systems.

3.12.   <u>Environmental Laws and Regulations</u>.   To Sellers' Knowledge, Sellers are in compliance with all Environmental Laws with respect to the operation of the Systems.

3.13.   <u>Real Property</u>.   <u>Schedule 3.13</u> contains complete and accurate descriptions of all the Real Property and Sellers' interest therein.   No Real Property is owned in fee by Sellers. There is no easement or other real property interest, other than the Real Property, that is required, or that has been asserted by a Governmental Authority or other Person to be required, to conduct the business or operations of the Systems. Sellers have delivered to Buyer true and complete copies of all instruments pertaining to the Real Property (including any and all amendments and other modifications of such instruments). All Real Property (i) is available to Sellers for immediate use in the conduct of the business or operations of the Systems, and (ii) complies in all material respects with all applicable building or zoning codes and the regulations of any Governmental Authority having jurisdiction.

3.14.   <u>Non-Infringement</u>.   The operation of each of the Systems as currently conducted does not infringe upon, or otherwise violate, the rights of any Person in any patent, copyright, trade name, trademark right, service mark, service name, patent right, license, trade secret or franchise, and there is not pending or, to Sellers' knowledge, threatened any action with respect to any such infringement or breach.

3.15.   <u>Tradenames</u>.   Except as listed on <u>Schedule 3.15</u>, Sellers use no tradenames or other designations in the conduct of the operation of the Systems.

3.16.   <u>Books and Records</u>.   All of the books, records, and accounts of the Systems are in all material respects true and complete, are maintained in accordance with good business practices and all applicable Legal Requirements, and accurately present and reflect in all material respects all of the transactions therein described.

3.17.   <u>Accounts Receivable</u>.   Sellers are the true and lawful owners of the Accounts Receivable and have good and clear title to each account, free and clear of all Liens, with the absolute right to transfer any interest therein. Each such account is (i) a valid obligation of the account debtor enforceable in accordance with its terms, and (ii) in all material respects, a true and correct statement of the account for merchandise actually sold and delivered to, or for

Error! Unknown document property name.          20

actual services performed for and accepted by, such account debtor, and no further act under any circumstances is required to make such Accounts Receivable payable by the account debtors. None of the Accounts Receivable are subject to any present or contingent offset or counterclaim. This Section 3.17 is merely a representation as to the collectability of the Accounts Receivable as of the date hereof and, pursuant to Section 7.1(a), the Closing Date, and not of their payment.

3.18.  Bonds.  Except as set forth in Schedule 3.18, there are no franchise, construction, fidelity, performance or other bonds, or letters of credit, posted or required to be posted by Sellers in connection with any of the Systems or the Assets.

3.19.  No Rights of First Refusal.  Except as set forth on Schedule 3.19, there is no right of first refusal, option or other similar right granting any Person the right or option to purchase, lease or obtain any other ownership interest in any of the Assets or any of the Systems.

3.20.  Finders and Brokers.  Sellers have not employed any financial advisor, broker or finder or incurred any liability for any financial advisory, brokerage, finder's or similar fee or commission in·connection with the transaction contemplated by this Agreement for which Buyer will in any way have any liability.

3.21.  Accuracy of Schedules.  All Schedules to this Agreement relating to Sellers' representations and warranties are accurate and complete in all material respects as of the date of this Agreement.

3.22.  No Misrepresentation.  No representation or warranty by Sellers in this Agreement, nor any written statement or certificate furnished to Buyer by Sellers pursuant hereto or in connection with the transactions contemplated hereby, contains any untrue statement of a material fact, or omits to state a material fact necessary to make the statements contained therein not misleading.

3.23.  Taxpayer Identification Number.  Sellers' U.S. Taxpayer Identification Numbers are as set forth in·the introductory paragraph of this Agreement.

3.24.  Guarantors Net Worth.  As of the date hereof, the Guarantors collectively have a net worth of not less than Fifteen Million Dollars ($15,000,000).

3.25. <u>Guarantors' Representations</u>.  Each of the Guarantors hereby represents and warrants (all of which representations and warranties shall survive until all Sellers' Obligations are indefeasibly satisfied in full), that:

(a)     such Guarantor has full legal capacity to execute and deliver this Agreement and to perform the obligations set forth in Section 11.15 hereof.

(b)     This Agreement constitutes the legal, valid and binding obligation of such Guarantor enforceable in accordance with its terms.

(c)     The execution, delivery and performance of this Agreement will not violate any requirement of law applicable to such Guarantor or any material contract, agreement or instrument to which such Guarantor is a party or by which he or it or any of his or its property is bound or result in the creation or imposition of any mortgage, lien or other encumbrance on any of the property or assets of such Guarantor pursuant to the provisions of any of the foregoing.

(d)     No consent of any other person or entity (including, without limitation, any creditor of such Guarantor) and no consent, license, permit, approval or authorization of, exemption by, notice or report to, or registration, filing or declaration with, any governmental authority is required in connection with the execution, delivery, performance, validity or enforceability of this Agreement.

(e)     No litigation, arbitration, investigation or administrative proceeding of or before any court, arbitrator or governmental authority, bureau or agency is currently pending or, to the Knowledge of such Guarantor, threatened with respect to such Guarantor's obligations hereunder or any of the transactions contemplated by this Agreement.

### ARTICLE 4
### BUYER'S REPRESENTATIONS AND WARRANTIES

Buyer represents and warrants to Sellers, as of the date of this Agreement and as of Closing, as follows:

4.1.  <u>Organization and Qualification of Buyer</u>.  Buyer is a limited liability company duly organized and validly existing under the laws of the State of Delaware, and has all requisite power and authority to own and lease the properties and assets it currently owns and leases and to conduct its activities as such activities are currently conducted. Buyer is duly qualified to do business in the State of Florida.

4.2.  <u>Authority</u>.  Buyer has all requisite company power and authority to execute, deliver and perform this Agreement and consummate the transactions

contemplated hereby.    The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby on the part of Buyer have been duly and validly authorized by all necessary action on the part of Buyer. This Agreement has been duly and validly executed and delivered by Buyer, and is the valid and binding obligation of Buyer, enforceable against Buyer in accordance with its terms.

4.3.   No Conflict; Required Consents.    The execution, delivery and performance by Buyer of this Agreement do not and will not (i) conflict with or violate any provision of the Articles of Formation, Operating Agreement or other organizational documents of Buyer; (ii) violate any provision of any Legal Requirements; (iii) conflict with, violate, result in a breach of, constitute a default under (without regard to requirements of notice, lapse of time, or elections of third parties, or any combination thereof), accelerate, or permit the acceleration of the performance required by, any agreement to which Buyer is a party or by which Buyer or the assets or properties owned or leased by it are bound or affected; or (iv) except as set forth on Schedule 4.3, require any consent, approval or authorization of, or filing of any certificate, notice, application, report, or other document with, any Governmental Authority or other Person.

4.4.   Taxpayer Identification Number.    Buyer's  U.S.  Taxpayer Identification Number is as set forth in the introductory paragraph of this Agreement.

4.5.   Finders and Brokers.    Buyer has not employed any financial advisor, broker or finder or incurred any liability for any financial advisory, brokerage, finder's or similar fee or commission in connection with the transaction contemplated by this Agreement for which Sellers will in any way have any liability.

### ARTICLE 5
### COVENANTS

5.1.   Certain Affirmative Covenants of Sellers.    Except as Buyer may otherwise consent in writing, between the date of this Agreement and Closing, Sellers shall (i) operate the Systems only in the usual, regular, and ordinary course (including completing line extensions, fulfilling installation requests and maintaining equipment and inventory at historic levels consistent with past practices); (ii) continue normal marketing, advertising, and promotional expenditures with respect to the Systems; (iii) maintain the Assets in good condition and repair, ordinary wear excepted; (iv) duly comply in all material respects with all applicable Legal Requirements consistent with past practices; (v) perform their obligations under all the Contracts without default; (vi) give to Buyer, and its counsel, accountants, and other representatives full access

Error! Unknown document property name.    23

upon reasonable advance notice during normal business hours to the Systems, all of the Assets, and Sellers' books and records relating to the Systems and the Assets; (vii) make all reasonable efforts to furnish to Buyer and such representatives all such additional documents, financial information, and other information with respect to the Systems or the Assets as Buyer may from time to time reasonably request; (viii) make all reasonable efforts to preserve the good will of existing relationships with customers and others having business dealings with the any of the Systems; and (ix) take all steps necessary to convey the Assets to Buyer.

5.2.  <u>Certain Negative Covenants of Sellers</u>.  Except as Buyer may otherwise consent in writing (which consent will not be unreasonably withheld or delayed) or as contemplated by this Agreement, between the date of this Agreement and Closing, Sellers shall not (i) modify, terminate, renew, suspend or abrogate any Assumed Contract; (ii) modify, terminate, renew, suspend or abrogate any License; (iii) transfer, convey or otherwise dispose of any of the Assets except in the ordinary course of business; (iv) take any action that would result in the creation of a Lien on any of the Assets; (v) engage in any marketing, subscriber installation or collection practices that are inconsistent with the past practices of Sellers; (vi) implement any increase or decrease in the rates charged for any Services (except as specifically called for under the terms of the Bulk Service Agreements) or make any changes in programming or give any notices to subscribers or local authorities concerning any changes in rates or programming, or make any commitment regarding changes in or continuation of rates or programming, except pursuant to a Legal Requirement or Judgment or programming changes pursuant to any programming agreement to which Sellers are subject; (vii) solicit or participate in negotiations or discussions of any kind or nature with any third party with respect to the sale of the Assets or any of the Systems or any other transaction inconsistent with those contemplated hereby or permit any other Person to do any of the foregoing; (viii) other than in the ordinary course of business, enter into any single Contract involving a commitment of more than Five Thousand Dollars ($5,000) or any Contracts which in the aggregate involve a commitment of more than Twenty Thousand Dollars ($20,000) (subject, in any case, to Buyer's right not to assume any such Contract, in which event such Contract would not be an Assumed Contract included in the Assets to be transferred at Closing).

5.3.  <u>Bulk Sales</u>.  Sellers shall comply with all Legal Requirements relating to bulk sales applicable to the transactions contemplated hereby.

5.4.  <u>Taxes</u>.  All sales, use, transfer, and similar Taxes, fees, and assessments arising from or payable in connection with the transfer of the Assets shall be paid by Sellers.

5.5.  Consents.  Sellers shall use commercially reasonable efforts to obtain, in form and substance satisfactory to Buyer, as promptly as possible all Consents.  Buyer shall be afforded the opportunity by Sellers to be involved in the process of obtaining Consents.

5.6.  Estoppel Certificates.  Sellers shall use commercially reasonable efforts to obtain estoppel certificates in the form attached hereto as Exhibit E ("Estoppel Certificates") for each of the Bulk Service Agreements (other than the Falcon Parc Bulk Service Agreement).  Buyer shall be afforded the opportunity by Sellers to be involved in the process of obtaining Estoppel Certificates.

5.7.  Joint Communications.  Sellers shall use all reasonable efforts to coordinate with Buyer all communications with the Systems' subscribers and community groups concerning the transactions contemplated herein, including without limitation, providing for joint written communications to community groups and affording Buyer an opportunity to participate in all community meetings, if any.

5.8.  Changes in Condition.  Sellers shall promptly inform Buyer in writing of any materially adverse change in the condition (financial or otherwise) of the Assets or business of any of the Systems occurring after the date of this Agreement; provided, however, that the disclosure to Buyer of any such material adverse change shall not relieve Sellers of liability for, nor shall the provision of such information by Sellers to Buyer be deemed to be a waiver by Buyer of, the breach of any representation or warranty of Sellers contained in this Agreement.

5.9.  Financial Information.  At Buyer's request, Sellers shall promptly deliver to Buyer, within twenty (20) days after the end of each month, true and complete copies of all monthly subscriber and billing reports and any reports with respect to the operation of any of the Systems prepared by or for Sellers at any time from the date of this Agreement until Closing.

5.10.  Employees of the Systems.  Buyer shall be under no obligation to offer employment to any Person employed in connection with the Systems.

5.11.  Cooperation in the Obtaining of Consents.

(a)  Buyer shall use its commercially reasonable efforts at its expense to assist Sellers in obtaining all Consents necessary for the transfer of or assignment to Buyer of the Licenses and Assumed Contracts.

(b)  Subsequent to Closing, if Buyer shall have elected, in its sole discretion, to close prior to obtaining all Consents, Sellers shall cooperate and, on a commercially reasonable basis, participate in efforts to obtain as promptly

as possible any Consent required to be obtained that was not obtained on or before Closing, provided Sellers shall have no obligation to incur any expense in obtaining any such Consent. The obligations set forth in this subsection shall survive Closing and shall not be merged in the consummation of the transactions contemplated hereby.

(c)  From Closing until each Consent is obtained, Sellers shall act as the agent for Buyer, and shall, as directed by Buyer, preserve the benefit of and enforce the Assumed Contract or other right to which such Consent pertains to the fullest extent permissible under the applicable Assumed Contract or other right. Upon request by Buyer, at Closing Buyer and Sellers shall enter into an agency agreement in a form mutually satisfactory to each party specifying the terms of such agency.

(d)  The covenants of Sellers expressed in Subsections (b) and (c) of this Section 5.11 shall cease and be of no further force and effect at the end of the fourth (4th) full month after Closing.

5.12.  Transitional Services and Use of Headend Equipment.  Sellers shall provide Buyer the benefits of the transition services, including without limitation, the use of the Headend Equipment for each System, in each case in accordance with the terms of a Transition Services Agreement in the Form attached hereto as Exhibit A with such specific services and terms and rates for services as the parties may agree upon in accordance with provisions of Sections 7.1(q) and 7.2(f) hereof. After Buyer has completed the interconnection of the Systems to its cable plant, Sellers shall be solely responsible for the Headend Equipment, including any removal of the same, and restoration of the property on which the Headend Equipment is located if required by any Governmental Authority.

5.13.  Capital Leases. Sellers shall pay the remaining balances on any capital leases for vehicles and computer equipment included in the Assets and any other Personal Property, and deliver title to such Personal Property free and clear of all Liens to Buyer at Closing.

5.14.  Use of Names and Logos. For the term to be specified in the Transition Services Agreement, Buyer shall be entitled to use the trademarks, trade names, service marks, service names, logos, and similar proprietary rights of Sellers, if any, to the extent incorporated in or on the Assets transferred to it at Closing, provided that Buyer shall exercise reasonable efforts to remove all such names, marks, logos, and similar proprietary rights of Sellers from the Assets as soon as reasonably practicable following Closing. Buyer will indemnify and hold Sellers harmless from and against all claims, actions and expenses (including, without limitation, attorneys' fees and costs in all trial, appellate, bankruptcy and post-judgment proceedings) asserted

against or incurred by Sellers arising out of such use by Buyer, provided that such claims, actions and expenses are not the result of any fact or circumstance that would constitute a breach of the representation and warranties contained in <u>Section 3.14</u> hereof.

5.15. <u>Supplements to Schedules</u>. Sellers shall, from time to time prior to Closing, supplement the Schedules to this Agreement with additional information that, if existing or known to it on the date of this Agreement, would have been required to be included in one or more supplements to this Agreement. For purposes of determining the satisfaction of any of the conditions to the obligations of Buyer in <u>Section 7.1</u>, the Schedules to this Agreement shall be deemed to include only (i) the information contained therein on the date of this Agreement and (ii) information added to the Schedules by written supplements to this Agreement delivered to Buyer prior to Closing that (a) are accepted in writing by Buyer or (b) reflect actions permitted by this Agreement to be taken prior to Closing.

5.16. <u>Notification of Certain Matters</u>. Sellers shall promptly notify Buyer upon learning of any fact, event, circumstance, action or omission (i) which, if known at the date of this Agreement, would have been required to be disclosed in or pursuant to this Agreement, or (ii) the existence or occurrence of which would cause any of Sellers' representations or warranties under this Agreement not to be true in any material respect. Notice of any of the matters specified above shall not act as a waiver of any of Buyer's rights or Sellers' obligations hereunder except that Sellers shall not be obligated to close unless the fact, event, circumstances, action or omission constituting a breach has been remedied or Buyer has provided Sellers with a written waiver of the same.

5.17. <u>Commercially Reasonable Efforts</u>. Buyer and Sellers shall each use commercially reasonable efforts to take all steps within its power, and will cooperate with the other party, to cause to be fulfilled those of the conditions to the other party's obligations to consummate the transactions contemplated by this Agreement that are dependent upon its actions, and to execute and deliver such instruments and take such other commercially reasonable actions as may be necessary to carry out the intent of this Agreement and to consummate the transactions contemplated hereby.

5.18. <u>Post-Closing Access to Personnel Records</u>. For a period of one year from the Closing Date, Sellers shall provide Buyer from time to time, during normal business hours and upon reasonable notice from Buyer, with access to, and the right to make copies or extracts of, pertinent information from the personnel files and records of Sellers relating to employees of the Systems who are hired by Buyer in connection with any Litigation, payment of Taxes or any other valid business reason.

Error! Unknown document property name.   27

5.19. <u>Confidentiality</u>. The existence and terms of this Agreement, the transactions contemplated herein and any non-public information that either party may obtain from the other in connection with this Agreement shall be deemed confidential, and each party shall keep confidential any such information whether related or unrelated to the Systems or Assets (any such information referred to as "<u>Confidential Information</u>"). Each party shall not disclose any Confidential Information to any other Person (other than its Affiliates and its and their directors, officers and employees, and representatives of its advisers and lenders, in each case, whose knowledge thereof is necessary in order to facilitate the consummation of the transactions contemplated hereby) or use such information to the detriment of the other; provided that (i) such party may use and disclose any such information once it has been publicly disclosed (other than by such party in breach of its obligations under this Section) or which, to its knowledge, rightfully has come into the possession of such party (other than from the other party), and (ii) to the extent that such party may, in the reasonable judgment of its counsel, be compelled by Legal Requirements to disclose any of such information, such party may disclose such information if it has used commercially reasonable efforts, and has afforded the other the opportunity, to obtain an appropriate protective order, or other satisfactory assurance of confidential treatment, for the information compelled to be disclosed. The obligation set forth in this Section shall continue for a period of two (2) years after Closing or the termination of this Agreement.

5.20. <u>Programming Deletions</u>. By no later than thirty (30) days prior to the Closing Date, Sellers shall provide written notice to the subscribers of each of the Systems, in compliance with Legal Requirements, of any programming services to be deleted from the Systems prior to the Closing Date, pursuant to <u>Section 7.1(l)</u>, and if requested by Buyer, shall notify the subscribers of the Systems of any new channels to be added by Buyer.

5.21. <u>Open Video Licenses</u>. By not later than thirty (30) days after Closing, Sellers shall surrender all open video licenses.

5.22. <u>Falcon Parc</u>. If, prior to Closing, Buyer obtains a bulk service agreement for the Falcon Moss Apartments through competitive bidding, then Falcon Moss shall no longer be deemed to be a party to this Agreement, and, accordingly, its assets will not be included in the Assets, and it will have no obligation or liability for or on account of any representation, warranty or covenant of Sellers in this Agreement.